# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

BOBBI L. COLLINS and PATTI
JOHNSON,

        Plaintiffs,

vs.

CENTER FOR SIOUXLAND, an Iowa
Nonprofit Corporation; BARRY
McARDLE; and JAN KLIMIADES;

        Defendants.

No. C10-4015-PAZ

**ORDER ON MOTION FOR
SUMMARY JUDGMENT**

————————————

Defendant Center For Siouxland ("CFS") is an Iowa nonprofit corporation that provides comprehensive human services to residents of the Sioux City, Iowa, area ("Siouxland"). The Corporation for National and Community Service (the "Corporation") is a federal agency that provides federal grants to qualified local agencies to operate "Senior Companion" programs. The purpose of these programs is to induce older citizens to provide companion services to elderly clients. A Senior Companion can receive pay, a small hourly stipend, a meal, and mileage for such services. Prior to September 29, 2009, CFS received about $500,000 annually in grant money from the Corporation to operate a Senior Companion program in Siouxland. CFS also received grant money for Senior Companion services from two other programs, one called the Medicaid Waiver Program and the other the Monona County grant.[1]

Plaintiff Bobbi Collins was employed by CFS as the "Coordinator" of its Senior Companion services programs until September 4, 2008, when her employment was terminated. On September 30, 2008, Plaintiff Patti Johnson was hired to fill Collins' position, but eight months later, on May 21, 2009, Johnson's employment was terminated.

---

[1]The Senior Companion program funded by the Corporation did not cover Monona County, Iowa. The Monona County grant funded these services for Monona County.

Defendant Barry McArdle was employed by CFS as the Vice-President of Senior Programs and the Director of Senior Companion Programs, and defendant Jan Klimiades was the President and CEO of CFS.

In this lawsuit, Collins and Johnson claim that CFS terminated their employment in retaliation for their efforts to bring to light CFS's misuse of federal grant money. In Count 1 of their complaint, they allege that CFS terminated their employment in violation of the whistleblower provisions of the False Claims Act ("FCA") (31 U.S.C. §§ 3729 *et seq*.). *See* 31 U.S.C. § 3730(h). In Count 2, they allege McArdle and Klimiades terminated their employment because of their whistleblower activities, in violation of Iowa public policy. In Count 3, they ask for judgment against CFS, under the doctrine of *respondeat superior*, for the wrongful acts of McArdle and Klimiades alleged in Count 2. The defendants deny they committed any wrongful acts, deny any misuse of federal funds, and deny that the plaintiffs' employment was terminated unlawfully. In fact, they deny having any knowledge of protected activities by the plaintiffs during their employment at CFS, and assert that both Collins and Johnson were terminated for legitimate, lawful reasons.

On March 3, 2011, the defendants moved for summary judgment. Doc. No. 22. In support of their motion, they filed a brief (Doc. No. 22-1), a statement of material facts (*id*.), and an appendix (Doc. No. 22-2). On April 7, 2011, the plaintiffs filed a resistance to the motion (Doc. No. 26), supported by a brief (Doc. No. 26-1), a response to the defendants' statement of material facts (Doc. No. 26-2), a statement of additional material facts (*id*.), and an appendix (Doc. Nos. 26-3, 4, 5, and 6). On April 13, 2011, the defendants filed a reply brief and a response to the plaintiffs' statement of additional material facts. Doc. No. 27. On May 16, 2011, the court telephonically heard arguments on the motion, and the parties have filed post-hearing briefs (Doc Nos. 32 & 33). The motion now is fully submitted.

# I.  BACKGROUND

Collins began working at CFS on April 4, 2001.  On May 1, 2006, McArdle was hired by CFS as the Director of Senior Companion programs.  At the time of McArdle's hire, Collins' duties including working with the Director of Senior Companion programs, dealing with Senior Companions, and manually entering onto CFS's payroll records time and expense claims submitted by Senior Companions.  McArdle's first written review of Collins' performance was completed in May 2007, and was highly favorable.

On August 7 and 8, 2007, auditors from the state office of the Corporation performed an audit of CFS's Senior Companion program.  In an audit report dated September 4, 2007, the auditors were critical of the program, particularly its record keeping practices.  The auditors also were concerned that the number of Senior Companions in the program had fallen below the level required to satisfy the requirements of the grant.

At the time of the 2007 audit, Senior Companions would turn "time sheets" in to Collins twice a month.  She would use the information on the time sheets to manually create "payroll data sheets," which she would submit to McArdle for review and approval. If McArdle found errors, he would return the payroll data sheets to Collins for correction. After the payroll data sheets were approved by McArdle, they would be submitted for further approval by Donna Jensen, the CFO and HR officer of CFS.

The process was changed after the audit.  CFS implemented an "Excel-based" computer program to automate the tabulation of time and expenses and the computation of reimbursement levels.  The computer program was put in place before the end of 2007, but using the program proved to be complicated and difficult.

The above facts are not in dispute, but the parties present two contrasting versions of the aftermath of the 2007 audit and the move to the Excel-based program.  According to the defendants, Collins consistently and repeatedly made errors on the payroll data sheets, and was not keeping the Senior Companion services files up to date.  On

January 11, 2008, McArdle and Jensen met with Collins to discuss these problems. At the meeting, Collins was given a written warning about the "increasing number of errors in compiling payroll data for the Senior Companions." Despite the warning, Collins continued to make the same mistakes. The defendants claim that Collins made errors on at least one of the payroll data sheets submitted each month between the end of 2007 and September 4, 2008, the date her employment was terminated. The defendants point specifically to payroll data sheets Collins prepared on January 14, 2008, on which they claim she made numerous significant errors, including: (1) the entry of data for six Senior Companions from the previous pay period instead of for the current period; (2) entering incorrect holidays for 15 Senior Companions; and (3) submitting no payroll data for two Senior Companions. They also claim that those payroll data sheets were in such disarray that McArdle had to spend five hours organizing, reviewing, and correcting them.

On January 16, 2008, Collins was given another written warning. On January 22, 2008, McArdle and Collins both signed a document entitled "Performance Expectations for Ms. Bobbi Collins, Coordinator of Senior Companion Services" in which Collins was given until March 30, 2008, to achieve "one hundred percent accuracy" on payroll records. According to Klimiades, despite Collins' precarious position with CFS, during a meeting on April 11, 2008, she "star[ed] off into space, asked few questions, and appeared unconcerned and uninterested." Also according to Klimiades, on May 22, 2008, at a meeting requested by Collins, Collins told Klimiades that she "guessed she would have to resign her position at CFS" because she was being excluded from meetings scheduled to correct the Senior Companion files. Collins also told Klimiades she was under a lot of stress from her job, and it was making her nervous and sick.

After a compliance visit in August 2008, auditors from the Corporation again found numerous errors in CFS's Senior Companion records. The defendants claim that a majority of those errors were made by Collins. On September 4, 2008, at a meeting attended by Collins, McArdle, and Jensen, McArdle terminated Collins' employment. McArdle advised

Collins that she was being terminated because, despite repeated warnings, the Senior Companion services files were not up to date, and she was continuing to make errors on the payroll records even though it was more than a year since the Excel-based program had been put in place. The defendants allege that, throughout the time Collins was employed by CFS, they were unaware of any complaints made by her about any of the defendants being engaged in or aware of illegal or fraudulent activity in connection with the Senior Companion program.

Collins tells a different story. She alleges that, before the 2007 audit, she noticed that McArdle was improperly making changes to Senior Companion records. When she asked him about it, he directed her to just record his changes. She also noticed that Senior Companions were being paid for seeing clients they had not seen. When she asked him about this, he told her to "let them go." According to Collins, she was not satisfied with these responses, so she took her concerns to Klimiades and Jensen, but to no avail.

Collins claims that, after the 2007 audit, Klimiades, Jensen, and McArdle made plans to set her up as the "scapegoat" for CFS's "many failings." To support this claim, she points to an exchange of emails between Klimiades and Jensen in January 2008. Jensen first wrote the following email to Klimiades:

> The meeting went ok although he [McArdle] was late. I called him but he didn't answer so I went to his office and got him. I gave him copies of Bobbi's [Collins] comments and he didn't really have much in the way of comments. He did say Bobbi has been extremely nice to him the last two days. I told him to take that with a grain of salt. She'll lull you into complacency all the while she's busy taking notes and documenting everything. I told him that I could tell by reading it that Bobbi didn't write it herself and he agreed. I said that you had said he was going to document the errors for today's timesheets and I would like to read that before it is given to Bobbi. I reminded him to stick to the facts and not include opinions. Short and sweet was better since the extra stuff is usually what gets you into trouble. I talked about what we talked about with the Human Rights Commission and unemployment.

The plan is that he is going to work on a performance improvement plan to be instituted Friday. He will have something for me on Thursday morning and we will go through it together. I told him to think about it - while 1 thing is ok it would have to be a major thing. Does that one thing make everything right in the world? I told him that I would think there should be at least half a dozen or a dozen things that would need improvement and that would be measurable. We talked about the acceptable error rate, etc. I suggested a 30-day plan - that allows for 2 more stipend periods.

I also asked him to think about the last few months (since the audit) and any conversations he's had with Bobbi about performance. We want to show that we thought she was doing an acceptable job but the detailed audit proved otherwise. He needs to document anything he can think of so that he can show there's been an ongoing problem for months rather than weeks. It was only the last few weeks that were the final straw and led to official written warnings. I also asked him to detail the errors a little more - how much, how many, etc.

Klimiades responded with the following:

A couple of things I can think of ………..
* does not follow procedures and does not use appropriate forms when submitting purchase orders and check requests.
* no improvement in the use of an excel spreadsheet created and implemented in August 2007.
* no improvement in the calculation accuracy of Senior Companion payroll, following the identification of multiple errors by the Corporation during their compliance visit August 07. (Barry should have copies of the reports that were in error.)

About a month before Collins' employment was terminated, she complained to Sandy Wienhold, a member of the CFS Board of Directors, about problems at CFS. She told Wienhold that billings submitted under the Monona County grant program included charges for people who were no longer Senior Companions, and billings for Senior Companions who had provided no services. She also told Wienhold that McArdle had been making changes to Senior Companion personnel files using whiteout, and had forged other documents in the files. Wienhold told Collins she would check into the situation. She

contacted Klimiades about Collins' concerns, and Klimiades told her that Collins was a disgruntled employee and assured her that there were no problems with the records. Based on these assurances, Wienhold did nothing further about Collins' complaints.

Collins' employment was terminated on September 4, 2008. A short time later, she contacted the auditors from the Corporation and advised them of what she believed to be improper activities by McArdle, including paying Senior Companions who were not seeing clients, paying Senior Companions for more hours than they actually worked, and keeping people on the list of Senior Companions who were no longer Senior Companions. Acting on Collins' information, the auditors requested that CFS provide extensive documentation relating to CFS's Senior Companion program.

On September 30, 2008, plaintiff Patti Johnson was hired to replace Collins. One of Johnson's first duties was to gather the documents requested by the Corporation because of Collins' information. Johnson spent her first several weeks on the job organizing and copying the 17,000 pages of documents required to respond to the Corporation's request. Because Johnson was spending most of her time copying documents and no one at CFS knew how to use the Excel program, CFS got behind in its billings. According to Johnson, McArdle addressed the situation by inventing information and altering documentation to support claims for grant money.

On December 23, 2008, Johnson met with Jensen about these issues. According to Jensen's notes of the conversation, Johnson told her that McArdle was "asking her to do things that she was very uncomfortable with and that she didn't want to do." According to these same notes, Johnson told Jensen:

> [McArdle] wanted her to adjust waiver hours so that more would be billed than had been completed so that they would receive more money. She stated that from the training with Siouxland Aging, her understanding was that a unit was one visit and Medicare reimburses at $6.53 per unit. Barry wanted her to bill at $17+ so the hours should be adjusted to reach that. (I don't remember the exact amount she stated). Barry also wanted her to bill for times when a visit was scheduled but

7

didn't happen. She stated that she had told Barry that she was very uncomfortable with doing this and after telling him that several times, he told her to "stop saying that". She said she told him that she wouldn't bill for $17+ until she had talked to Jan or I. She also stated that Barry also had told her to "quit bothering Jan and Donna – they're busy and have a lot to do. Especially do not bother Jan." She also said that Bobbi was billing at $6.53 per hour from what she could tell. She has the months ready to go pending this decision. She stated that it had taken her awhile to get the hours from Earlene.

I told her that $6.53 was the approved Medicare rate and that would be the amount we needed to bill at. I told her to go ahead and continue to bill as Bobbi had done for the last three months of the year that are due ($6.53 per hour but do not include the no-visits) and we would figure this all out before the January billing.

According to Klimiades' notes of a meeting attended by Klimiades, McArdle, Johnson, and others on January 20, 2009, Johnson interrupted Klimiades at least four times to raise questions about what she believed to be billing improprieties by McArdle. Each time, Klimiades informed Johnson that she would take care of these issues. When Johnson was not satisfied with Klimiades' responses, she "slammed her hands on the table and stormed out of the room, slamming the door behind her."

On February 2, 2009, shortly after an investigatory visit to CFS by Corporation auditors, Johnson sent the following email to Klimiades:

For some time, I have had concerns about the way the December Waiver sheet was done. Barry [McArdle] did fill out that sheet on the computer, while he had me look up the amount of maximum time for each companions visits that Siouxland Aging would pay. This is different than it had previously been done. Earlene had looked over the sheet and marked the appropriate hours on the sheet previously. The total amount was a lot larger than in October. When I printed the sheet out and gave it to Donna, I told her that Barry had gone through and changed quite a few of the clients to maximum bill. He had even told me on one approval notice to submit the

waiver billing even though the companion had not yet been assigned a client, but later changed this after I had to call Siouxland Aging to get a medicaid number and the girl asked for the name of the new companion. When I said none was assigned yet, she said we couldn't bill then, so Barry did not bill this one. Siouxland Aging has instructed myself and Earlene to just bill for the hours the client was seen. I do not understand your or Barry's attitude that I cannot call for help on this issue to Siouxland Aging or to the State so that I am sure I am doing these right. I have had to call Siouxland Aging many times. Siouxland Aging says you can't bill for hours not seen and so did Donna. I do not understand why everyone is making such a big deal about this. It's simple, call Siouxland Aging and then we would know.

I probably did not have such fears until you said at the meeting that the inspector General said he didn't care if it was a clerk, janitor or vice president, they will be arrested on the spot and put in fail if fraud is committed. No one gave me any training on the waivers, no one knew how to do them because Bobbi was not here long enough to train anyone. I did the best I could with the notebook I found on the waivers. In addition, Barry has told me not to bother you or Donna with what he calls petty issues, so he had put me between a rock and a hard place. Now Barry is having the approval notices sent directly to him by secure email. Since I have been here, I have been thru a state audit and photocopying 17,000 copies because of complaints from a former disgruntled employee. This employee continues to have information funneled to her through staff members still employed here and some of the senior companions. I have worked on 3 or 4 Sundays due to emergencies. I have had my salary reduced substantially and lost the ability to pay for health care with that reduction. I have worked hard, here, and been willing to put in the extra hours when needed. I have tried to work with my two co workers to best of my ability. I feel that I have not been treated fairly and equitably especially on this issue. I am not trying to cause trouble. I am scared to be doing waiver billing without sufficient training and information and felt that you saying to just do what Barry says was unfair since he probably knows less than I do about the waivers.

> Understand that I am not saying that I won't do the waivers,
> under any circumstance, just saying I want a better
> understanding of them. Since you reduced my hours, but not
> my duties, I certainly have no problem if you want to assign
> them to someone else. Please advise me if you think the board
> should be contacted?  I just want to come to work and do my
> job and now have to fear that I have done something that is
> illegal with the state or the federal government.

Johnson alleges that, after she sent this email, McArdle continued to defraud the federal government, so on April 15, 2009, she sent a packet of materials to the Corporation.  In her cover letter to the Corporation, she stated, "I know I am probably jeopardizing my job, but at this point I feel like the fraud and dishonesty that has prevailed here since I began my employment cannot be ignored and I do not want to participate in this, of which I am not sure if it is honest or not."

On April 27, 2009, Johnson contacted Kevin McManamy, a member of the CFS Board, and informed him about what she believed to be fraudulent billing practices at CFS. During the call, Johnson told McManamy that she was invoking her privileges as a whistleblower.  Later that day, Johnson received a written disciplinary warning for making threats to fellow employees and for acting in an intimidating manner.  The warning arose from an incident which took place on April 23, 2009, when Johnson reportedly pulled out her cell phone in the presence of two other employees and stated, "[McArdle] yelled at me and I have it all on here because my phone records conversations."  She reportedly then stated, "be careful what you're saying.  I have my phone with me and I can record everything."  The disciplinary warning was a "Level 3" disciplinary action, the most severe level of disciplinary action under CFS's personnel policies.  Klimiades called local attorney Becky Nelson, a member of CFS's Board of Directors, about the incident and asked what she could do.  Nelson told her that the employee was an "employee at will," and if the employee is disruptive, the employee could be terminated.

On May 13, 2009, the Corporation audited the records of the Senior Companion program.  The night before the audit, Johnson met with the auditors and provided them with

information concerning what she believed to be fraudulent activities by McArdle. During the audit, auditors discovered numerous errors in Senior Companion time sheets and personnel files. On May 15, 2009, CFS separately audited the Monona County grant and found significant errors in the billings under the grant.

Shortly before the audit, Johnson phoned Sandy Wienhold, the same member of the Board of Directors Collins had called shortly before her termination. Johnson told Wienhold that she believed she was going to be fired by CFS, but she felt she had to report irregularities in McArdle's billings. Wienhold again called Klimiades, and Klimiades again assured Wienhold that she would take care of the situation. On May 18, 2009, Wienhold resigned from the Board.

On May 19, 2009, a CFS employee, Tasha Voloshen, sent an email to Klimiades that stated as follows:

> This morning at 7:55 a.m. Patti Johnson was walking by my office with another lady. She was talking loudly. Her words were: I feel sick; this is not a healthy place to work. I am getting sick just by coming here. It was said in a very negative tone of voice. I do not appreciate the co-workers who were saying things about our agency that are not true.

On May 21, 2009, Klimiades terminated the employment of both Johnson and McArdle. According to Klimiades, Johnson's employment was terminated because of the errors uncovered during the most recent audits and because of her disruptive behavior, including the behavior documented in the written warning of April 27, 2009. The defendants allege they are unaware of any complaints made by Johnson while she was employed at CFS that any of the defendants were engaged in or aware of illegal or fraudulent activity in connection with the Senior Companion program.

On June 18, 2009, the Corporation advised CFS that it was denying funding to the Senior Companion program after September 29, 2009. The decision was appealed, but the denial of funding was affirmed.

## II. ANALYSIS

The court will apply the usual summary judgment standards. *See Torgerson v. City of Rochester*, ___ F.3d ___, No. 09-1131, 2011 WL 2135636, at *7 (8th Cir. June 1, 2011).

### A. Immunity under Iowa Code § 504.901

Defendants McArdle and Klimiades argue that they have immunity from liability for the state law claims asserted against them in Count 2 of the complaint under Iowa Code § 504.901, which provides as follows:

> 1. Except as otherwise provided in this chapter, a director, officer, employee, or member of a corporation is not liable for the corporation's debts or obligations and a director, officer, member, or other volunteer is not personally liable in that capacity to any person for any action taken or failure to take any action in the discharge of the person's duties except liability for any of the following:
>> a. The amount of any financial benefit to which the person is not entitled.
>> b. An intentional infliction of harm on the corporation or the members.
>> c. A violation of section 504.835.[2]
>> d. An intentional violation of criminal law.

They argue that, because they were acting as employees and officers of a non-profit corporation, this statute provides them with immunity from the plaintiffs' state law claims. They further argue that none of the four exceptions applies. The plaintiffs argue that McArdle and Klimiades do not have immunity because their actions fell under exceptions (b) and (d).

Subsection (b) provides that an officer or employee of a nonprofit corporation has no immunity from "liability for … [a]n intentional infliction of harm on the corporation or the members." On its face, this exception would seem not to help the plaintiffs, since they

---

[2]Iowa Code 504.835 relates to director liability for unlawful distributions.

are not suing McArdle or Klimiades on behalf of CFS or its members. The plaintiffs claim, however, that, since CFS is vicariously liable to them for the wrongful actions of McArdle and Klimiades, and since their wrongful actions were intentional and resulted in harm being inflicted on CFS, the requirements of exception (b) are satisfied.

The argument is not consistent with the plaintiffs' pleadings. In Count 2, the plaintiffs claim they were harmed personally by the actions of McArdle and Klimiades, not that McArdle or Klimiades intentionally inflicted harm on CFS. Furthermore, the argument is circular and unpersuasive. The plaintiffs argue that, since CFS is vicariously liable for the actions of McArdle and Klimiades in intentionally harming them, McArdle and Klimiades thereby intentionally harmed CFS. The court does not credit this line of reasoning. It is based on an overly broad interpretation of exception (b) under which the exception would, in effect, swallow the rule. The court concludes that exception (b) does not deprive McArdle or Klimiades from immunity under section 504.901 for this claim.

The plaintiffs assert that McArdle violated 18 U.S.C. § 1001 when he made false statements to the government. They claim that he thereby lost his immunity because exception (d) provides that there is no immunity from "liability for …[a]n intentional violation of criminal law." Again, the plaintiffs' argument is off the mark. In Count 2, they do not assert a claim based on the fact that McArdle and Klimiades are liable to them because of McArdle's alleged violations of federal criminal law. Rather, they claim that McArdle and Klimiades are liable to them for terminating their employment in retaliation for their attempts to bring to light McArdle's alleged violations of federal criminal law. Their claim does not fit within subsection (d).

McArdle and Klimiades are entitled to immunity under section 504.901. None of the exceptions applies. Their motion for summary judgment on Count 2 is **granted**.

## B. *Respondeat Superior* Liability

In Count 3 of the complaint, the plaintiffs seek to impose *respondeat superior* liability on CFS for the wrongful acts of McArdle and Klimiades alleged in Count 2 of the complaint. CFS claims that, since McArdle and Klimiades are immune under Iowa Code § 504.901, CFS cannot be vicariously liable on the same claim. CFS argues that an employer cannot be held liable for the acts of its employee unless the employee is liable for those acts, citing *Brosamle v. Mapco Gas Products, Inc.*, 427 N.W.2d 473, 475 (Iowa 1988).

In *Brosamle*, the court recited the general proposition that under the principle of respondeat superior a master is liable for the negligent acts of a servant. *Id*. The court then stated, in *dicta*, that, "[u]nder this scheme of vicarious liability, the master has no liability unless the servant is liable." *Id*. From these principles, CFS argues that, since its employees McArdle and Klimiades are immune from suit under section 504.901, CFS cannot be vicariously liable for their conduct.

The principles set forth in *Brosamle* do not address the question presented here, which is whether an employer can be held vicariously liable under the doctrine of *respondeat superior* for conduct of an employee who is immune from suit. The question is answered by the Restatement (Second) of Agency, Section 217: "In an action against a principal based on the conduct of a servant in the course of employment … [t]he principal has no defense because of the fact that … the agent had an immunity from civil liability as to the act." CFS can be held vicariously liable for the state law claims asserted against McArdle and Klimiades even though they are immune from liability for those claims.

CFS alternatively argues that the plaintiffs cannot prevail on their state law claim because they cannot show that protected activity was a motivating factor in their discharge. *See Carrington v. City of Des Moines*, 481 F.3d 1046, 1052-53 (8th Cir. 2007). This question will be addressed in subsection II(C)(4) of this order.

## C. Title 31 U.S.C. § 3730(h)

The whistleblower provision of the False Claim Act provides, in part, as follows:

> (1)Any employee … shall be entitled to all relief necessary to make that … whole, if that employee … is discharged … because of lawful acts done by the employee … in furtherance of [a "qui tam" action under 31 U.S.C. §§ 3730(b)[3]] or other efforts to stop 1 or more violations of the FCA].

31 U.S.C. § 3730(h)(1). The Eighth Circuit Court of Appeals recently stated that, in order to establish an FCA whistleblower retaliation claim, a plaintiff must prove that "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 566 (8th Cir.2004) (citing *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 932-33 (8th Cir. 2002)). CFS argues that it is entitled to summary judgment on Count 1, the plaintiffs' FCA retaliation claim, because the plaintiffs cannot prove these elements.

### 1. Protected activity

CFS asserts that, when the plaintiffs were discharged, they were not engaged in conduct protected by the FCA. The legislative history of § 3730(h) suggests that "[p]rotected activity … be interpreted broadly" S.REP. NO. 99-345, at 35 (1986), and the court will follow that suggestion.

For the plaintiffs to prove that they were engaged in protected activity, they must show two things:

> First, the employee's conduct must have been in furtherance of an FCA action. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir.1996) (quoting 31 U.S.C. § 3730(h)).

---

[3]"A person may bring a civil action for a violation of section 3729 for the person and for the United States Government." Under § 3729(a)(1), a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for treble damages and a civil penalty.

> Second, the employee's conduct must be aimed at matters
> which are calculated [to], or reasonably could lead[ ] to[,] a
> viable FCA action. *Id*.

*Schuhardt*, 390 F.3d at 567.  To prove a retaliation claim, the plaintiffs are not required to prove an actual *qui tam* claim, but only are required to show that they had a good faith, reasonable belief that their employer possibly was committing fraud on the government. *Wilkins*, 314 F.3d at 933.

The facts in *Schuhardt* are remarkably similar to the facts of the present case. Schuhardt was employed as a "coder" for the defendant university's department of surgery. In that position, she reviewed patient files and determined the appropriate billing structure. Many of the bills she reviewed were for submission to various federal agencies for payment.  Schuhardt became concerned about the billings because some were for work performed by a teaching physician when the work actually had been performed by residents, fellows, or nurses' assistants.  Schuhardt complained about this to her supervisor, but her complaints were ignored.  She told her advisors that she thought the university's billing practices were illegal and fraudulent, and that she believed that, if the Office of Inspector General were to investigate, it would "frown" on these practices and "pretty much wipe us out." *Schuhardt*, 390 F.3d at 565.  Schuhardt alleges that she was eventually discharged because of these complaints.  Schuhardt then filed a *qui tam* action against the university, and included a separate claim under 31 U.S.C. § 3730(h) for retaliation.  The district court dismissed Schuhardt's § 3730(h) claim on summary judgment, but the claim was reinstated by the Eighth Circuit Court of Appeals.  The court reviewed the two requirements for a showing that conduct was "protected activity," i.e., that it (1) be in furtherance of an FCA action, and (2) be aimed at matters which reasonably could lead to a viable FCA action, and found that Schuhardt had made out a *prima facie* case.  The court focused on the fact that the plaintiff believed there had been an effort to modify patient records, and advised her supervisor that she believed these activities might be fraudulent and illegal.  She mentioned that a government agency would forbid the practice if it was

aware of it. She also complained to the university over a confidential hotline, and copied files that she believed to be evidence of the fraud.

Notably, the court did not require proof that Schuhardt actually was planning to file a *qui tam* action, or that she even knew what a *qui tam* action was. The court stated that "[t]he protected activity element of a retaliation claim does not require the plaintiff to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation." *Id.* (citing *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004)); *see McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) ("An employee … need not expressly know that the FCA allows *qui tam* actions to be filed against their employer, or have already filed such an action to be protected from retaliation under § 3730(h)."). "Indeed, § 3730(h) protects internal whistleblowers who make a complaint about fraud against the government." *Schuhardt*, 390 F.3d at 565 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)); *see also Green v. City of St. Louis*, 507 F.3d 662, 668 (8th Cir. 2007) (an FCA retaliation claim can be asserted if employee alerted employer to possible fraud on the government).

The conduct of Collins and Johnson mirrors the conduct of Schuhardt. Collins and Johnson believed that McArdle was fraudulently changing billing records. They told their supervisors about it, complaining first to McArdle and then to Klimiades about McArdle's activities and their belief that his actions might be fraudulent and illegal. They both took their concerns to members of the board of directors. They both warned about possible legal action by the government as a result of what they perceived to be wrongful conduct by McArdle. As in the *Schuhardt* case, Johnson made copies of files that she believed to be evidence of the fraud and took them home. In fact, she actually delivered those documents to government investigators before she was discharged. *See McKenzie*, 219 F.3d at 516-17 (requiring a nexus between and complaints and possible legal action by or on behalf of the government).

CFS argues that, since neither Collins nor Johnson had a specific belief that she was pursuing or intending to pursue an FCA claim while employed by CFS, neither of them could have been engaging in protected activity. While this certainly is one possible interpretation of what is required to maintain a § 3730(h) action, it is not the one adopted by the Eighth Circuit Court of Appeals. Collins and Johnson both have made out a *prima facie* case that they were engaged in protected activity at the time of their discharge.

### 2. Knowledge by employer

CFS next argues that it had no knowledge that either of the plaintiffs was engaged in protected activities when her employment was terminated. The identical argument was asserted in *Schuhardt* on almost identical facts. The court summarily dismissed the argument because Schuhardt had made statements to her supervisors communicating her belief that the university's billing practices were fraudulent and illegal. The court found that those statements, by themselves, were sufficient to overcome a motion for summary judgment based on lack of notice. *Schuhardt*, 390 F.3d at 568 (citing to authorities from the First, Fifth, and Ninth Circuits).

Collins and Johnson both made similar statements to their supervisors. Therefore, they have made a *prima facie* case that CFS knew they were engaged in protected activity when they were discharged.

### 3. Retaliation

To avoid summary judgment on Count 1, the plaintiffs must prove that CFS retaliated against them by subjecting them to a materially adverse employment action because of their protected activities. Any reasonable person would consider the plaintiffs' discharge from employment to be a materially adverse employment action.

### 4. Motivation for discharge

According to the court in *Schuhardt*, the fourth requirement of a successful whistleblower retaliation claim is that the retaliation must have been motivated solely by the plaintiff's protected activity. 390 F.3d at 566. The plaintiffs argue that the court in

*Schuhardt* misstated the law, and that they need only show that their protected activity was a determinative factor in their discharge. Alternatively, they argue that, even if they ultimately may have to prove that retaliation was the sole motivation for their discharge, they do not have to meet this burden at the summary judgment stage of the proceedings.

Section 3730(h) provides that an employee may bring a whistleblower retaliation claim if the employee is discharged "because of lawful acts done by the employee." This language would appear to require the employee to show only that the discharge was "because of" the employee's whistleblower activity, not that it was "solely because of" this activity. This is not, however, consistent with what the Eighth Circuit Court of Appeals has said on this question. In *Schuhardt*, the court stated that the plaintiff was required to prove that "the retaliation was motivated solely by the plaintiff's protected activity" *Schuhardt*, 390 F.3d at 566. Although causation was not an issue in *Schuhardt*, the court, in setting out the elements fo a whistleblower retaliation claim, included "sole motivation" as an element because the court had done so in *Wilkins*, a case that also had nothing to do with causation. In *Wilkins*, the court cited to *Norbeck v. Basin Electric Power Cooperative*, 215 F.3d 848, 851 (8th Cir. 2000), which is the source of the "sole motivation" requirement set out in *Wilkins* and *Schuhardt*.

In *Norbeck*, the plaintiff was the Chief Auditor of the defendant electric company. He sued the company under § 3730(h) for terminating his employment in retaliation for protected activity under the act. The case was tried to a jury, which found in a special verdict "that Norbeck had proven that he had engaged in activity protected by the Act, that [the employer] knew or should have known that he was engaged in such activity, and that [the employer's] decision to terminate him was motivated in whole or in part by retaliatory animus." *Norbeck*, 215 F.3d at 849-50. As instructed by the district court, the jury then went on to consider whether the employer had proven that it would have fired Norbeck even if he had not engaged in protected activity. The jury found for the employer on this question and awarded Norbeck no damages. *Id.* at 850.

On appeal, Norbeck argued that the district court had erred in giving the jury a dual motive instruction because "allowing a dual motive defense reduces the legal protection for whistleblowers and undermines the effectiveness of the Act." *Id.* He contended that "the court committed reversible error by instructing that [the employer] would be entitled to a verdict in its favor if it could prove that Norbeck would have been fired regardless of engaging in activity protected under the Act." *Id.* The court noted the following:

> The Act itself simply provides that "[a]ny employee … who is discharged … because of lawful acts done … in furtherance of an action under this section … shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h) (1994). A plaintiff must therefore prove that the discharge was because of protected activity, but the statute does not explicitly say whether the plaintiff must prove that retaliation was the only cause in order to recover. Likewise, no mention is made of an affirmative defense for an employer. The legislative history indicates, however, that Congress intended a two step inquiry before relief could be available, similar to other whistleblower statutes[.]

*Id.* (alteration in original).

The court in *Norbeck* held that the district court did not err in giving a dual motive instruction. *Id.* at 851. In reaching its decision, the court observed as follows:

> The leading case dealing with dual motive issues is *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), in which the Supreme Court held that such a defense could prevail in employment cases raising First Amendment claims. When such a plaintiff has demonstrated that his protected conduct was a "substantial" or "motivating" factor, the burden shifts to the employer to show that it would have reached the same decision even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. 568. The Court noted the unfairness of denying such a defense to employers: "[a] rule of causation which focused solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place the employee in a better position as a result of the exercise of constitutionally

> protected conduct than he would have occupied had he done
> nothing." *Id*. at 285, 97 S.Ct. 568.

*Id*. at 851-52; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S. Ct. 1775 (1989) (applying a similar analysis to Title VII employment discrimination actions). After ruling that an employee has the burden only of showing that her protected conduct was a "substantial" or "motivating" factor in the adverse employment action, but that the employer had a defense if it can show it would have reached the same decision even in the absence of the protected conduct, the court proceeded to list "sole motivation" as an element an employee must show to establish a whistleblower retaliation claim

After *Norbeck*, the Eighth Circuit has stated repeatedly that, for an employee to establish an FCA whistleblower retaliation claim, the employee must prove that any retaliation was motivated solely by the employee's protected activity. This appears to have been a mistake, one that was perpetuated inadvertently in *Schuhardt*, 390 F.3d at 566. Although this may be a correct description of the final result of a process that begins with giving the dual motive instruction to the jury, it does not help the court at the summary judgment stage of the case. *Norbeck* was not a summary judgment case, but was an appeal from a jury verdict. At this point in the process, the court must determine whether there is evidence in the summary judgment record to support the plaintiffs' claims that they were terminated because of their whistleblower activities. If there is, the court then must determine whether CFS has shown it would have reached the same decision absent the protected activity.

The court finds that on the record before it there is sufficient evidence to support the plaintiffs' claims that they were terminated because of their whistleblower activities to avoid summary judgment. The court also finds that there are fact questions for the jury on the question of whether CFS would have reached the same decision absent the protected activity. Summary judgment on the plaintiffs' whistleblower retaliation claim is **denied**.

### D. State Law Claim

In Count 3, the plaintiffs assert a claim against CFS under Iowa law for the tort of wrongful termination. Iowa law recognizes such a cause of action:

> An at-will employee has a cause of action in tort for wrongful termination of employment when discharged by an employer in violation of public policy. *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281 (Iowa 2000). This cause of action is a recognized exception to the at-will employment doctrine, which would otherwise serve to deprive a wrongfully discharged employee of a remedy. *Id.* In first adopting this public policy exception in 1988, we determined the cause of action was necessary to prevent the conduct of an employer to fly in the face of clear public policy. *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560-61 (Iowa 1988). We also recognized that our employment laws should accommodate the clear expectations of a worker, and protect against the improper interference with those expectations. *Id.* No employee should face the dilemma of giving in to improper threats by employers or be subject to discharge without a remedy. *See Fitzgerald*, 613 N.W.2d at 284; *Jones v. Lake Park Care Ctr., Inc.*, 569 N.W.2d 369, 377 (Iowa 1997) ("Terminating an employee for refusing to do an illegal act is a violation of public policy.").

*Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 683 (Iowa 2001).

Iowa law permits an employee to bring an action for the tort of wrongful discharge when "a protected activity has been recognized through the implementation of an underlying public policy that would be undermined if an employee were discharged from employment for engaging in that activity." *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003). In order to succeed on such a claim, the employee must demonstrate the following four factors:

> (1) The existence of a clearly defined public policy that protects an activity.
> (2) This policy would be undermined by a discharge from employment.
> (3) The challenged discharge was the result of participating in the protected activity.

(4) There was a lack of other justification for the termination.

*Id.*; *see Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) (listing the four elements of a claim alleging wrongful discharge in violation of public policy); *accord Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998) (identifying the elements of a wrongful-discharge claim rooted in a violation of public policy as (1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge).

For summary judgment purposes, the plaintiffs have established that they were engaging in protected activity and they were discharged. Under Iowa law, the elements of causation and motivation are "generally more suitable for resolution by the finder of fact." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 2821 (Iowa 2000). Summary judgment on this claim is **denied**.

## IV. CONCLUSION

The defendants' motion for summary judgment is granted in part and denied in part, consistent with the above ruling.

**IT IS SO ORDERED.**

**DATED** this 15th day of July, 2011.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT